Weldon, J.,
delivered the opinion of the court:
This case was brought within the jurisdiction of the court by the passage of the following act of March 3,1887, ch. 387 (24 Stat. L., 568): ' -
“ Be it enacted, etc., That the Secretary of the Treasury is hereby authorized and directed to deliver up the so called < Twiggs swords/ which are now in his custody, and which were captured or seized by General B. F. Butler, in eighteen hundred and sixty-two, to such person, or to the legal representatives of such person, as was owner thereof at the time they were captured or seized. For the purpose of determining who was such owner the Secretary of the Treasury shall send the petitions of all persons who may claim said swords to the Court of Claims. Said court shall thereupon examine such claimant or claimants, and such other legal evidence as may be offered in behalf of such claimant or claimants, and determine who was such owner and who is entitled to receive said swords under the provisions of this act. Said court shall certify their judgment to the Secretary of the Treasury: Provided, however, That all claims for said swords shall be filed with the Secretary of the Treasury within three months from the passage of this act.”
Qn the day of the date thereof the following communication was addressed to this court by the honorable Secretary of the Treasury.
“ Treasury Department, June 13,1887.
“ To the honorable the Chief-Justice and the Judges of the Court of Claims:
“ Pursuant to the provisions of an act of Congress approved March 3, 1887, entitled ‘ An act authorizing the President to return the Twiggs swords/ I have.the honor to transmit herewith to your honorable court for hearing and determination the following petitions, which have been filed in this Department under the provisions of said act, to wit:
“A. C. Myers, executor of the will of David E. Twiggs, deceased, filed March 15, 1887; Bowen a Guedalla, filed April 19, 1887.
a Respectfully, yours,
“C. S. Fairchild,
“ Secretary.”
*453 The following are tbe petitions. accompanying said communication and referred to in said letter:
“ Petition of A. 0. Myers, executor and guardian.
“ To the Secretary oe the Treasury:
“Sir: In June, 1862, General David E. Twiggs was the owner o.f three swords which were seized by Major-General B. F. Butler and are now in the custody of the Secretary of the Treasury. I am the duly appointed executor of the said Twiggs, and am rightfully entitled to the possession and custody of the same, and therefore, under the act of the Forty-ninth Congress, approved March 3, 1887,1 file this my petition for their delivery to me in accordance with the provisions thereof. A copy of said act is herewith enclosed.
“Very respectfully, your obedient servant,
“A. O. Myers,

u Executor and guardian of the minor child, etc.”

“ Petition of Rowena Guedalla.
“ To the honorable C. S. Fairchild, the Secretary of the Treasury of the United States of America:
“ Respectfully represents Rowena Guedalla, born Rowena Florance, wife of Joseph Guedalla, solicitor, of London, in the United Kingdom of Great Britain and Ireland, that in the month of May, A. D. 1862, she was the owner and possessor of three swords, known as the ‘ Twiggs swords.’
“ That she has ever since been the owner of and entitled to the possession of said swords.
“ That in May, 1862, General B. F. Butler, then commanding the United States forces iii New Orleans, took said swords forcibly from your petitioner and thereafter sent them to the President of the United States.
“ That said swords are now in your possession and custody for the United States of America, and that your petitioner was owner of said swords at the time they were captured or seized as aforesaid, and has been ever since and is now the owner of said swords.
“Wherefore your petitioner claims said swords as being the owner of said Twiggs’s swords now and at the time they were captured as aforesaid, and prays that the said swords may be delivered to her in accordance with the provisions of the law in that behalf made and provided.
“Rowena Guedalla.
“London, England, March 31,1887.”
It will be seen by reference to these petitions that the claimant A. C. Myers prosecutes this case as the executor of Gen *454 eral David B. Twiggs, and the claimant Mrs. Bowena Gue-dalla as the owner at the time of the alleged seizure.
Considered simply as a judicial inquiry, the issue presented by the pleadings and proof is a strange one, especially in this court. Our ordinary jurisdiction is to determine issues for or against the Government, but in 'this case we are called upon, to adjudge the rights of private parties upon a subject-matter strange and unusual in its character. The duty of the court in the premises is defined by the law, in substance as follows: “ For the purpose of determining who was such owner, the Secretary of the Treasury shall send the petitions of all persons who may claim said swords to the Court- of Claims. Said court shall thereupon examine such claimant or claimants, and such other legal evidence as shall be offered in behalf of such claimant or claimants, and determine who was such owner, and who is entitled to receive such swords under the provisions of this act.”
The facts are substantially as follows: General David- B. Twiggs was for many years an officer in the U. S. Army, and was by birth a citizen of the State of Georgia. For services in the war of 1812 and the Mexican war, Congress, at the close of the latter war, presented him a sword, as a recognition of his faithful services as one of the officers of the American army engaged in the prosecution of those wars. Actuated by the same appreciation of his public services, the State of Georgia and the city of Augusta each presented him with a sword. The three swords thus acquired are* the matters in controversy in this case. In, the year 1861 and early part of 1862, General Twiggs, having joined the Confederate army, was in command of the city of New Orleans, but not at the time of capture; and on the approach of Major-General Butler, with the Federal forces, he abandoned the city by way of Mississippi Biver and went to the city of Augusta, in the State of Georgia, where he died in a few months. On leaving the city, on the morning of the 25th of April, 1862, or a short time before, he left with the contestant Bowena Guedalla his three swords and a large box of silver. The silver comprised, to some extent, the accumulation of his family, a portion of which came from the father of his first wife. General Twiggs was twice married, and left surviving him by the first wife a daughter, who is now the wife of the contestant A. C. Myers, who'prosecutes this case as exec *455 utor of the estate. Of his second marriage, which occurred in 1854, he left surviving him, as his son and heir, John Washington Twiggs, who now claims through said executor.
The delivery of the swords and silver was made to eontest-»ant, Mrs. Guedalla, by General Twiggs on his way from his residence to the boat which conveyed, him up the river, and was surrounded by the consternation and excitement incident to a flight from the approach of an enemy who was necessarily much dreaded. On the delivery of the swords and silver, upon the suggestion of a third party, General Twiggs wrote in -pencil and gave to Mrs. Guedalla the following paper :
“ I leave my swords to Miss Bowena Florance and box of silver.
“ D. E. Twiggs.
- •“ N. O., 25th April, 1862.”
After the capture and fall of the city of New Orleans, and thé possession of it by General Butler, as the commander of the Federal forces, it was ascertained by him that on the flight of General Twiggs he left in the possession of a young lady of the city his swords and plate, and upon investigation the identity of that young lady was established in the person of Mrs. Guedalla.
She was summoned before General Butler,' and after some resistance and remonstrance she was compelled to deliver the swords and plate to the Federal authorities. The commanding general, as a trophy of war, and for the purpose of giving military emphasis to the capture and fall of the city, sent the swords to the President, to be placed in public possession, as a memorial of Federal success. -They have so remained for more than twenty-seven years, and now the court, under a special and peculiar law of Congress, is to determine their ownership, and consequently right of possession, as between these two, contestants. The United States have no interest in the result of this case, except to have properly settled, by the rules of law, who was the owner of the swords at the time of capture. The contention is between a person who claims as a donee, deriving title (as it is alleged) through a perfect and executed gift, and persons who claim as the rightful and lawful heirs of David E. Twig'g.
They both claim from and through a common source of *456 title — one as from a gift and tbe other by legitimate and lawful inheritance. In determining the legal force and effect of the possession of Mrs. Guedalla, and the circumstances attending the inception of that possession at the time of capture, it is not inappropriate to consider the relations existing between the parties to this controversy and the common source of title. Mrs. Guedalla was at that time about nineteen years old and unmarried, her maiden name being Rowena Florance; had been and was on terms of social intimacy with General Twiggs. That relation of intimacy did not extend to the members of his family, and seems to have grown out of her association with Miss Belinda Adams, who was a niece of the second Mrs. Twiggs, and. who had died in the year 1861. The family of General Twiggs for several years before the war, and during the year 1861, consisted of his daughter, Mrs. A. C. Myers, who, after the death of his second wife, in 1855, lived with him and was the head of his household; and his son, who was seven years old at the time of the capture of New Orleans. It does not appear that as between Mrs. Guedalla and Mrs. Myers there were any social relations.
Miss Adams and claimant were very intimate school-mates, and the attachment for her, on the part of General Twiggs, seems to have been founded, in a great measure, upon his recognition of that relation. There is no evidence that as between General Twiggs and his family there was any estrangement or unkindness. Mrs. Myers lived with him from 1855 to March, 1862, when, for temporary purposes, she went to the State of Yirginia. His son remained at his home and accompanied him, in his flight from the city on the 25th of April, 1862. The evidence shows that as late as March, 1862, when Mrs. Myers left for Yirginia, these swords were in the parlor of General Twiggs’s house, and were talked of by the family as to their descent and worth as relics and heirlooms. The legal question presented for our decision is, Do the facts make a bailment for safe-keeping, or an executed gift inter vivos 9 Much stress is laid upon the fact that at the time of the capture Mrs. Guedalla was in possession of the swords, and that by virtue of that possession certain legal presumptions arise as to ownership. It is true that a presumption of ownership or title does arise from the possession of personalty; but it is the lowest form of presumption, and is subject to be rebutted by proof *457 and the circumstances attending and surrounding the possession.
It is not necessary to indulge in any criticism of construction upon the paper executed at the time of the delivery; that instrument is not relied on as a muniment of title, but evidence of the fact that the gift was fully consummated, it having been promised and delivered, as it is claimed, in the early part of January, 1862. It was written under circumstances -not well calculated to enable a party to discriminate as to the force of a word, and must be read in the light of the circumstances of its execution, the character of the property affected by it, and the social and domestic condition of the party executing it. Under the law of Louisiana, as under the laws of every civilized community, tbe wife and children succeed to the estate of the husband and father, and where a party asserts a claim, founded on a gift, in derogation of that right, the claim must be satisfactorily established. It is insisted that inasmuch as the heirs of the estate made no claim to these swords until the year 1878, it is a strong argument against their right, and tends to the acknowledgment of the claim of Mrs.-Guedalla, who, in the year 1869, instituted legal proceedings in the courts of Hew York against General Butler to recover the value of the swords.
The evidence shows that not until the year 1878 the heirs first brought or attempted to bring to the consideration of the Government a desire on their part to recover the' swords in -dispute; but there is no direct evidence tending to show that they ever recognized or. acknowledged the title of Mrs. Guedalla. It may be that they knew of the contest between her and General Butler, but that was not for the specific thing in controversy here; and without any acknowledgment upon their part of the adverse title they petition the Government, as a matter of grace and favor, to restore to them the swords. That petition, with the claim and petition of Mrs. Guedalla, formed the basis of the statute on which the rights of the parties are adjudicated.
After the capture by General Butler, and without reference to the ownership at the time of such capture, the swords, as property, passed to the United States as munitions of war, specially excepted by the Abandoned and Captured Property Act (12 Stat. L., § 1, p. 820); and it was left to the sovereign *458 grace of the Government to determine what should be the disposition of them ultimately. The heirs had no title they could assert against the captor, and no unfavorable inference can be drawn from the fact that they waited so long. If General Butler acted tortiously in the capture of the swords, he would have been responsible at the suit of a bailee, even although the •ultimate property was in another.
From the evidence and circumstances of the transaction, we must determine the intent and purpose of General Twiggs in leaving the swords in the possession of the contestant, and if 'he did not intend to give them to her, then, as against his heirs, she acquired nc title beyond that of a bailee. If it was not a gift, it was a deposit, and if a deposit, that ends the case in favor of the heirs and against Mrs. Guedalla.
Without deciding in this connection as to the exact date of the transaction, it is safe to assume that it was at a time when the approach of the Federal Army indicated the fall of the city into the dominion and control of that army which for months had been at its gates. The fact that Mrs. Guedalla, then but nineteen, had no means to defend her possession and was helpless in the resources of a custodian of treasure, do not imply that it was a gift and not a deposit. The very obscurity and helplessness of her condition may have been the reasons upon , which the delivery of the property was made. If it had been left in a public place, surrounded by the means of protection against ordinary loss, it might have been more likely to fall into the hands of a power having extraordinary means of search and seizure.
As has been said, the Government has no interest in the result of this proceeding, and one or the other of the contestants must prevail. It is the duty of the court to evolve, from the testimony and undisputed circumstances of the case, the truth of the controversy. The contestant, Mrs. Guedalla, is ■claiming as a gift a kind of property which was most likely to be kept for the inheritance of children ; and the changed relations of General Twiggs with the Government of the United States are not sufficient to impress upon it the character of mere material value. It is insisted that the swords and silver were given to her to be utilized as means of pecuniary value, to relieve her from the want incident to the results of civil war. The swords and the silver stand in the same relation of *459 title to the claimant; and if the reputed donor had lost all appreciation of the swords as mementoes of his attachment to the cause of the Government, yet it is difficult to understand why his connection with the Confederate army would lessen his appreciation for the heir-looms of his family.
We have but one issue to try — but one single duty to perform — and that is to determine as between the petitioners the ownership of the property at the time of capture. The policy of giving these swords to one or the other of these contestants has been decided by Congress, and the fact of ownership is the only question for us to decide. For the purpose of this case, under the statute authorizing this inquiry, the petitioner, A. C. Myers, has such a relation to the* estate as authorizes him to represent the heirs in this court. Holding as we do, that the delivery was a deposit, it is unnecessary that we examine the legal questions incident to the doctrine of gifts inter vivos so ably argued by counsel.
It is the decision of the court that David E. Twiggs was the owner of the swords at the time of capture, and that A. C. Myers is now entitled to the possession of them for the benefit ■of his heirs. And it will be so certified to the Secretary of the Treasury.